MORROW, &c.
*vs*
SMITH, &c.

---

# Morrow, &c. *vs* Smith, &c. and Same *vs* Allen, &c.

CHANCERY.

APPEAL FROM THE JEFFERSON CIRCUIT.

Case 23.

*Attachment in Chancery. Interlocutory order.*

JUDGE BRECK delivered the opinion of the Court.

Sept. 9.

THESE causes were consolidated and heard together in the Court below, and the same questions of law and fact being involved, and the testimony being the same in both, they have, in like manner, been heard together in this Court.

The case stated.

The appellees exhibited their bills in Chancery against J. C. & J. T. Guthrie, alledging that they were indebted to them in large sums, for merchandize which had been sold them, and charging that the purchases of the goods had been made by them with the fraudulent design of taking them to other places than where they had formerly been engaged in business, and of selling them at reduced prices for cash, and then to withhold payment and defraud their creditors. Upon these and other allegations of fraud, they prayed for and obtained an attachment, which was levied upon a quantity of merchandize, alledged to belong to said Guthries, or one of them, and which, at the time, was stored with Anderson & Co. at Louisville. These bills were filed and attachments levied on the 18th November, 1836. Shortly afterwards, the goods were

claimed by the appellant, Morrow, as the surviving part-
ner of Puryer & Morrow, and subsequently the appellant,
the administratrix of Puryer, united with Morrow in as-
serting and sustaining the claim set up by him.

The Court below decreed a sale of the merchandize,
*Decree of the Circuit Court.* and finally a *pro rata* distribution of the proceeds between
the appellees—from which decree Morrow and the ad-
ministratrix of Puryer have appealed to this Court.

The first and main question for consideration is, who
was the owner of the merchandize in controversy, at the
time it was attached. In the solution of this question,
it must be admitted there is some difficulty. The mer-
chandize was delivered to Anderson & Co. by the steam
boat Princeton, on the 12th November, 1836, with a bill
of lading dated at Helena, Arkansas, on the 4th Novem-
ber, 1836, reciting that a lot of goods had been received
from Jos. Guthrie, in good order, &c. and which was to
be delivered in like good order, to Thomas Anderson &
Co. at Louisville, &c. and signed by the Clerk of the
boat. The delivery of the goods was also accompanied
by the following note:

*Messrs. T. Anderson & Co.*—Gentlemen, please store
the above boxes for a few days, and oblige, yours, &c.

J. GUTHRIE.

The deposition of a Clerk in the establishment of An-
*The testimony of appellees.* derson & Co. proves: that he opened and examined the
lot of attached goods, that the outer boxes were marked
with some single letter, as he then recollected, and di-
rected to St. Louis—the inner or smaller boxes contain-
ed in those, or some of them, were marked J. C. Guthrie
& Co. Prior to this examination, Anderson & Co. had
sold something like thirty thousand dollars worth of goods
claimed by J. C. Guthrie & Co.—that the attached goods
contained pretty much the same private marks as other
goods which had been claimed by the Guthries, and which
he, witness, had examined, and the goods seemed to be
of same kind pretty much—the private marks of Guth-
rie were generally on prints and domestics, which were
the largest portion of the goods; that he did not recollect
examining all the goods with a special view of ascertain-
ing their marks, but all the marks he recollected to have

seen, were similar to those on goods which Guthrie had claimed as his—a portion of the goods, such as hats and shoes, &c. he did not examine, and did not know how they were marked, or whether marked at all; the goods were in bad order and appeared to have been badley handled; witness believed that the goods then belonged to Guthrie & Co. or had belonged to them, from the circumstance of the marks and their appearing to be of the same stock. Such are the circumstances and proof conducing to establish ownership of the goods in the Guthries or one of them.

The appellants, upon the other hand, in support of their claim to the goods, rely as follows: The Guthries both answer the appellees' bills, and in the most direct and positive manner, deny all the allegations of fraud; they deny that the attached goods belonged to them; they deny that they have any interest in them in any way whatever; they deny having sold to Morrow & Puryer, or either of them, directly or indirectly, any goods—the answers are full and very explicit.

The answers of the Guthries.

J. T. Guthrie, in his answer, states very circumstantially, how the goods in contest came into his possession; that about the 1st October, 1836, information reached Louisville, that Morrow, with the remaining portion of the goods, which he and Puryer had started down the river with, in the spring preceding, was in Arkansas in bad health; that their Clerk had died, and that Puryer, who had started for Kentucky and stopped to visit his family in Missouri, had been there taken sick and had also died.

Upon this information, Leverett Kasson, who had a large claim upon Morrow & Puryer, and who, in consequence of the death of Puryer and the reported condition of Morrow's health, apprehended that his stock of goods and other effects were in jeopardy, prevailed upon and made an arrangement with said Guthrie to go to his relief; that he found Morrow in Arkansas in bad health, and upon learning the death of his partner, he determined to send the residue of his goods to St. Louis—they were accordingly put on board the first boat that came up, the steam boat Princeton, bound to Louisville, in charge of

said Guthrie, to be left at the mouth of the Ohio—Morrow was compelled to remain a few days at Helena, to close his business there; that when the boat reached the mouth of the Ohio, in consequence of the weather being very wet and the impracticability of procuring a secure place of deposit, Guthrie determined to let them remain on board the boat and send them to Louisville; he accordingly requested the Clerk to give him a receipt for the goods, and he gave him the bill of lading before referred to, and prepared it as if made when the goods were first put on board at Helena; and he, at same time, gave the Clerk the note addressed to Anderson & Co. Guthrie left the boat at the mouth of the Ohio, and visited St. Louis and Illinois, as he intended when he left Louisville.

On the 3d December, 1836, the appellant, Morrow, exhibited his petition in the Court below, asserting claim to the attached goods, and praying to be made a defendant. He was made a defendant and filed his answer, in which he most emphatically denies that the Guthries, or either of them, had any interest in any portion of the attached goods; that when seized, and before and since, they were exclusively the property of himself and the representatives of his deceased partner; he denies having purchased any portion of them of the Guthries, or either of them; he gives a detailed account of the purchases made by himself and partner of the stock of goods with which they had left Louisville, about the 1st of April preceding, in a trading boat; that the stock amounted to about $7000, purchased of divers designated houses in Louisville; he explains also, how the goods came into the custody of J. T. Guthrie; that he requested him to take charge of the goods as stated in Guthrie's answer, to land them at the mouth of the Ohio, and re-ship them for St. Louis, whither he was going, and deliver them to the house of Taber, Shaw & Tatem; that in a few days afterwards, he, Morrow, went on to St. Louis and learned from said firm that Guthrie had been there and communicated the information and stated the circumstances under which the goods had been sent to Louisville, and had left for Illinois. This answer is, in all respects, full and

satisfactory, and is sustained, we think, by the testimony in the case. Portions of the goods are identified and proven by the very individuals of whom Morrow and his partner had purchased them. It is in proof that they had made purchases of various houses in Louisville. Puryer is proved to have been of good character—that he had means and was in good credit for several thousand dollars.

So much of the answer of J. T. Guthrie and of Morrow as state the circumstances under which the former left Louisville for Arkansas, to render assistance to Morrow, if needed, is fully sustained by the testimony of Kasson—he states that Guthrie went at his instance and at his expense.

It appears that the Guthries came from Pittsburg to Louisville, in the Spring of 1836, with a large assortment of goods, which were shortly after seized and sold by attachment. There is no evidence that they sent any portion of their goods lower down the river than Louisville, or that they had other goods than what they had vended or had been seized by attachments.

It appears from the testimony, that Morrow & Puryer packed up their goods at the store house or rooms of Kasson, who was an auctioneer and had sold portions of the goods of the Guthries, and that they had used boxes in which Guthries' good had been packed and which were marked J. C. Guthrie & Co.; that Morrow & Co. in the various lots purchased by them, may have got hold of goods which had belonged to the Guthries, is very probable, and in this way the marks upon portions of the attached goods may be accounted for. The boxes in which the merchandize was packed, when they reached Louisville and were delivered to Anderson & Co. were marked for St. Louis. This circumstance conduces to sustain the answer of Morrow and also of J. T. Guthrie, as to the destination of the goods when they left Helena, and as to the bill of lading which Guthrie states was made out in haste at the mouth of the Ohio. But the Guthries had been crushed and broken up at Louisville in the spring of 1836. There is no evidence that after that they had either goods or means; and would J. T. Guthrie, had he been the owner of the goods in question, or had any interest

in them, would he have sent them to Louisville, the thea-tre of his fallen fortunes and ruin, and where he could hardly hope they would escape the vigilance of his credi-tors? We think not. It appears that Guthrie was a con-nection of Morrow, and on that account was more rea-dily prevailed upon to go to his assistance, and the cir-cumstance also tends to explain and account for the man-ner in which Morrow had entrusted him with the goods. The appellees made Kasson a defendant, alledging that he was indebted to the Guthries or had their effects in his hands. The allegations are denied in his answer, and no decree rendered against him. The counsel for the appel-lees insist that Kasson was an interested witness, and that his testimony should be disregarded. It is true it does not appear that his claim upon Morrow & Co. had been discharged, but he sets up no claim to the goods in con-test nor to their proceeds, nor does it appear that he has any. The exception to his deposition was, therefore, we think, properly overruled.

In view of the whole case, we are of opinion the goods attached were the property of the appellants, and that the Court erred in decreeing the proceeds to the appellees.

A few days after the rendition of the final decree in these cases, it appears that Hamilton Smith, Esq. the attorney for the appellees, and to whom the Court had permitted to be loaned a portion of the money arising from the sale of the goods, brought the money and inter-est thereon into Court, and which was received by the Court in discharge of said Smith's obligation, and it fur-ther appears that said Smith was permitted by the Court forthwith to withdraw the money thus paid in, as the counsel of the appellees and on account of the decree. We are clearly of the opinion the Court should not have permitted the money thus to be withdrawn without notice to the appellants or their counsel, and thereby affording an opportunity for an appeal or resistance. It does not appear that the appellants or their counsel were present in Court, or had any notice of the motion thus to with-draw the money. As the Court had power over the de-cree, during the whole term of the Court, it should also have retained the control of the fund—at all events, it

Attaching credi-tor must show the attached property to be-long to the de-fendants.

On the sale of property attach-ed, and a decree for the payment of the proceeds to the attaching creditor, it is proper that the defendant or his counsel be noti-fied of such or-der, that he may resist it, or su-percede it by ap-peal, &c.

should not have entertained the motion to withdraw it without affording the opposite party an opportunity to resist it by appeal or otherwise.

It is, therefore, the opinion of the Court that the decree herein be reversed, and also the order authorizing H. Smith to receive and withdraw from the Court the sum of $1387 41, on account of said decree; that the causes be remanded with directions to dismiss the complainants' bills with costs; and that the money arising from the sale of the attached goods, be ordered to be paid over to the appellants; and upon their motion, that the Court make a rule upon said H. Smith to return into Court said $1387 41, or show cause to the contrary; and that the Court make such other and further orders, touching the premises, as may be equitable.

*Wheatly* for appellants : *Fry & Page* for appellees.

### PETITION FOR A RE-HEARING,

Sept. 21.

#### By Messrs. Fry & Page.

THE counsel for complainants respectfully ask a rehearing in these cases.

They have always expected to succeed in subjecting the goods upon the ground that Puryer and Morrow and Kasson had conspired with Guthrie & Co. to cover their property against creditors, and that Puryer and Morrow were the instruments by whom that purpose was to be accomplished.

If such was the purpose, it is not surprizing that they are all found answering fully and explicitly—indeed it was to be expected that they would so answer.

Guthrie & Co. had been broken up and were heavily in debt, and could hold nothing in their own names. If they were to enjoy property it must be in the names of others.

Puryer and Morrow were selected for that purpose, and hence in making purchases it would be done in their names. They may have bought of Radliffe a pretty large amount, and of others small amounts, and such purchases were, no doubt, to be put with certain goods already held by Guthrie & Co. Why is it if goods were

MORROW, &c.
vs
SMITH, &c.

purchased of any amount in Louisville of others, is it not proven? And why is it that with so much difficulty they send to New York and get the deposition of Radliffe, showing specific articles bought of him?

It is insisted that only small amounts were purchased of others, and that Guthrie & Co. had a pretty good stock, and that Puryer and Morrow bought such articles as were necessary to make up an assortment, and to give to the business the appearance of being their own.

It is difficult to show fraud in any other way than by circumstances. Men who are corrupt enough to cover property fraudulently, are generally ready to swear falsely, and expecting difficulty, are cautious in keeping out of view all traces of fraud, and invest the proceeding with every feature of fair dealing of which they are capable.

If fraudulent conveyances were to be ascertained only by the *oaths of the guilty parties*, it would rarely happen that such arrangements would be defeated. It is conceded that, nothing else appearing, answers must prevail: but it is contended that there are circumstances in these cases which defeat the pernicious effect given to them by this Court.

The attention of the Court is invited to the bill of lading. It is dated November 4, 1836, at Helena, and states that the goods are there received of Joseph Guthrie, to be delivered to Thomas Anderson & Co. at Louisville, and Guthrie appends to it a note signed J. Guthrie, requesting Anderson & Co. to store the goods for a few days.

It is shown that the outside boxes had no name on them, and were directed to St. Louis. Now J. T. Guthrie and Morrow state that it was the intention to send the goods to St. Louis, but that it was prevented by rain, &c. and that Guthrie then determined to send the goods on to Louisville to Anderson & Co. and took receipt of the Clerk, &c.

This Court, in their opinion, use the following language in reciting the answer of J. T. Guthrie: "He accordingly requested the Clerk to give him a receipt for the goods, and he gave him the bill of lading before referred to, and prepared it as if made when the goods

were first put on board at Helena, and he at same time gave the Clerk the note addressed to Anderson & Co." Now it is respectfully suggested that such is not the language of Guthrie's answer. It is this: "This respondent, therefore, requested the Clerk of the boat to give him a receipt for the goods, which the Clerk gave to him, in his, this respondent's own name." There is nothing said in the answer about the Clerk's preparing it as if made when the goods were put on board. It is supposed that if the date and place had occurred to Guthrie at the time of answering, it would have been perfectly convenient to have employed the language ascribed to him by the Court, but it happened that it did not.

The counsel for complainants would here remark, that the defendants have a singular facility in swearing. Their answers are all drafted by one Attorney, R. S. Wheatly, Esq. at Louisville. The administratrix of Puryer resided in Virginia; a petition for a change of venue is prepared by Mr. Wheatly in Louisville, asking a change of venue in consequence of the prejudice of the Chancellor, and is sent to Virginia, and the administratrix swears to it, and the venue is changed.

Now the opinion is hazarded, that the Chancellor had no knowledge of the parties, and that the oath was without foundation.

Again the answer of the administratrix is prepared in Louisville, in the handwriting of Mr. Wheatly, and is sent to Virginia, and she swears to the whole again. It is believed that none of them are at all scrupulous in swearing, and that they would be prepared to swear to any thing that might be written for them.

In 1837, Kasson, in his answer, swears to the correctness of the statements made by J. T. Guthrie and Morrow in their answers, and in his last deposition, taken in 1840, he states that J. T. Guthrie concluded to return the goods to him at Louisville, and that they were packed up, &c. Here we see Guthrie, Morrow and Kasson in their answer, in 1837, when they were all together and their lesson was well learned, swearing together, *fully* and *explicitly* and circumstantially, in nothing varying. But in 1840, Kasson, not recollecting his statement in 1837,

inadvertently no doubt, swears that the goods were returned to him at Louisville, and this no doubt was the truth, and is perfectly consistent with the bill of lading, and the fact that the goods were sent to Louisville.

After Puryer had died and Morrow was sick, and in such a country too, it was to be expected that Guthrie would feel it necessary to make new arrangements, and hence the plan upon which they acted was formed. It would have been very convenient, if the attachment had not defeated it, to have turned the goods at Anderson & Cos. over to Kasson or some other stake-holder.

This Court say that the boxes were marked for St. Louis, and this circumstance conduces to sustain the answer of Guthrie and Morrow, as to the destination of the goods when they left Helena. It will be noticed, that the outer boxes were marked only with a single letter and directed to St. Louis. This may be variously accounted for; they may have been boxes upon which the letter and the direction may have been standing for some time, picked up about an *auction house as other boxes*, and by Puryer and Morrow, as stated to have been.

It is a fact, known in all commercial places, that goods sent to auction houses are often marked with a single letter and some place; this is done for a disguise and to avoid often, the suspicion of selling at auction, not deemed very creditable in respectable merchants, but to which they sometimes resort. This is often, indeed nearly always, done by persons attempting to spirit away their goods, and get them beyond the scrutiny of their creditors.

Guthrie had been hunted by attachments and feared he might still be, hence it was convenient to mark with a single letter and St. Louis, for a mask. It may be that he feared that the eye of some one was on him at Helena, and that he directed to St. Louis to divert attention from the real point of destination, which is shown by Kasson's deposition and the bill of lading, to have been really Louisville when they left Helena.

No proof has been taken to show the correctness of the statement as to the intention of sending the goods no further than the mouth of Ohio, and the reasons for

changing that determination; no proof is taken to show that the bill of lading was made at the mouth of the Ohio instead of at Helena—the Clerk of the Princeton could have explained. It is supposed that the bill of lading was made, where, upon its face it imports to have been made, and that such conclusion could not be explained away.

The bill of lading is an ugly circumstance against defendants; the last deposition of Kasson, as to the destination of the goods, is an ugly circumstance; the coincidence of Guthrie, Morrow and Kasson in their answers, and the conflict of the answers and the depositions of Kasson, is an ugly circumstance. These circumstances unexplained, are certainly very forcible against the answers, and conclusive, connected with other facts in these cases, to convict defendants of fraud.

This Court say that the Guthries had been crushed and broken up in Louisville, and infer that Guthrie would not have carried the goods back for fear of his creditors. Now it will be observed that Guthrie was well acquainted with the operations of an auction house; that goods are not made public in such places; that the success of that business depends greatly upon not exposing the secrets of customers; the goods consigned to Anderson & Co. had no external marks to distinguish them, the outer boxes having nothing but some letter and St. Louis on them; no vigilant creditor would be likely to ferret them out, and hence he would not fear to send them to Louisville, and more especially as he would not be about them, gone as he was to St. Louis; Anderson & Co. are instructed to store them a few days. In the mean time Guthrie could order them to be handed over to Kasson, or applied in some other way to suit his purposes. This is all probable.

It will be discovered too, that the bill of lading is made out for Jos. Guthrie, and he writes to Anderson & Co. as J. Guthrie, instead of J. T. Guthrie, his true name. Straws show the wind, and this fact may have some weight.

This Court seem to think the relationship of Guthrie to Morrow a sufficient reason why he should have taken

such interest in the matter, and why he should have been intrusted with the goods.

It must occur to the Court that the relationship would readily suggest Morrow as a suitable instrument for Guthrie to effect his fraudulent purpose. This Court have often said, heretofore, that in such fraudulent arrangements, relations are most apt to be employed, that in none would such confidence so naturally be reposed as in relations.

But it will be perceived that the defendants do not pretend to offer that as a reason why Guthrie consented to go; Kasson prevailed on him, and he desired, as is alledged, to see Illinois, &c.

There is no proof of the claim of upwards of $4000, alledged to have been held on Puryer and Morrow by Kasson, after which he was so anxious to get some one to go to look, as is pretended.

If there be such claim at all, Kasson was certainly strongly biassed in showing the attached goods to be the property of Puryer and Morrow, *because* there are no other means out of which his claim could be paid, and if the goods are discharged from attachment, will he not look to them for payment, if in fact he have any claim. If there were no other reasons, Kasson should not be credited, when you look to his answer and his conflicting deposition, &c.

But there is another reason why he should not be credited. In the opinion which the Chancellor gave in these cases, before they were here the first time, he indicated the suspicious circumstances of fraud, and when this Court sustained the opinion of the Chancellor on the merits, and reversed simply because the representatives of the deceased partner, Puryer, were not before the Court as parties, and the cases went back to the inferior Court, Kasson is found willing to supply the want of evidence in the first deposition. He then swears, no doubt, to whatever he is instructed, and being anxious to swear enough to fix the matter, swears too much for the interest of his employers, and no doubt unintentionally, not knowing the effect of it at the time, swears to the truth as to the destination of the goods when they left Helena.

Radliffe gives his deposition away off in New York, and swears to facts after the necessity of them has been indicated by the Chancellor. Radliffe, as the Court must perceive, is a willing witness and should not be credited. The counsel for complainants will not repeat the arguments heretofore presented to the Court by brief, &c.

The counsel for complainants feel the fullest conviction that the decrees of the Circuit Court should be affirmed, and would respectfully and earnestly ask this Court to reconsider their opinion.

Respectfully, &c.      F.RY & PAGE.

## REPLICATION TO THE PETITTION,

By Mr. Wheatly.

THERE are no doubtful or difficult questions of law involved in these cases; the decision given depended alone on the facts alledged by the plaintiffs in the Court below, and denied by the defendants. There were but few depositions taken by the parties, and they were by no means lengthy or difficult to understand. To attempt, *at this time*, to write a long brief or replication, and to argue at length the merits of these cases, to the highest judicial tribunal in the State, would savour of arrogance in the counsel for the appellants, and of an intention to offer insult to this honorable Court.

To avoid the imputation of arrogance or of an intention to offend, the counsel for the appellants will, (more for form sake than from any apprehension of the necessity of a response to the petition,) very briefly notice the petition presented by the *junior counsel* for the appellees. There is only a single question for the consideration of this honorable Court, to-wit: Did the attached goods belong to J. T. Guthrie & Co. or did they belong to the late firm of Puryer and Morrow. The complainants in the Court below, alledge in their bills, that they belonged to J. T. Guthrie & Co. and four defendants, in their separate answers, under the solemnity of their oaths, positively and flatly deny the allegations. In support of the bills, the complainants offer two or three depositions of witnesses, who depose to a few facts and circumstances, tending to

MORROW, &c.
vs
SMITH, &c.

create suspicions *in their minds*, that the goods attached possibly might have belonged to J. T. Guthrie & Co.

But the defendants, (now appellants,) offer in support of their answers, some six or seven depositions of men, (whose credibility has not been assailed,) most clearly and positively proving every fact alledged in their answers, two of which depositions go on to explain, account for, and to wipe off every suspicious circumstance, detailed by the witnesses for the complainants; one of those witnesses appends to his deposition a large bill of goods, which he swears he himself sold to Puryer and Morrow, which goods are part and parcel of the attached goods. He further states, that he went in company with Morrow, and saw him make purchases at various houses in the city of Louisville; saw the goods packed up in the same room where his goods were kept, and accounts fully and clearly for the marks on the boxes; he did not know the two Guthries at all, except one by sight only. Another witness corroborates with Radliffe, as far as he goes, and then concludes emphatically as follows: "*That he knew all the stock of goods purchased by Puryer and Morrow in Louisville, which they took down the river with them, and he also knew of whom they purchased those goods, and he knows that none of that whole stock was purchased of J. T. Guthrie & Co. or of either of them;*" and he *gives the names and residences of those persons* of whom the goods *were purchased*. Here the evidence on the part of the appellants, was full and complete. It then became the duty of the appellees, if they expected to succeed, to disprove the evidence above alluded to, by competent proof; and how do they attempt to do this? They do not take a single deposition, though they had about two years to do so, if they had so chosen. They depended entirely upon the ingenuity of their counsel, in arraying suspicions, and in raising the hue and cry of a conspiracy to defraud creditors. The *junior counsel*, who prepared the petition, has shown some skill in stringing, arraying and presenting *his own suspicions* of the appellants and their witnesses: but unfortunately for him, they are only his *own suspicions*, unsupported by any evidence whatever. He complains that the answers of all the defend-

ants were drawn and prepared by R. S. Wheatly, the sole counsel for the appellants, and that one of those answers was sworn to in Virginia after having been prepared by the counsel in Kentucky, from which he infers that Mrs. Puryer would swear to any thing that might be written by the counsel, true or false, and therefore that she ought not to be believed on her oath.

This conclusion is not only untenable, but it is also uncourteous, especially when coming from a batchelor. It is known to the junior counsel that these goods were attached in the autumn of 1836. It is a fact, shown by the record, that Mrs. Puryer remained in Louisville as late as the autumn, 1838, and residing within a few hundred yards of her counsel; that she, every day for two years, had an opportunity of seeing and conversing with her counsel on the subject of these suits. She then had ample time to hear and know all about the facts and circumstances attending her suits, and even if she had gone immediately to Virginia, after the seizure of the goods, it is a fact well known in this country, that *some Virginians* are in the habit of educting their daughters sufficiently to enable them to read and write the English language so as to be able to correspond with counsel at a distance, if necessary, and after narrating such facts as they may know themselves, to require their counsel *to put these facts in the form of an answer in chancery*, which they may afterwards swear to—all this is susceptible of proof, though it may be unknown to the junior counsel in this case. It is also susceptible of proof, that the counsel for the appellants, who is charged with having drawn the answer, occasionally visits Virginia, and it is but reasonable to suppose that when in Virginia, or in any one of the Eastern States, he will visit his clients and draw answers for them, as well as make other necessary arrangements with them, if he has clients in the States he visits, and in this way *the gentleman might account for this answer being sworn to in* Virginia.

The petition charges that Kasson's deposition, last taken, differs from the one given by him at an early stage of the cause. It does differ in this: his deposition, as well as several others which were taken by Morrow, who

was not a lawyer—he filed interrogatories and took the depositions in the absence of his counsel, and failed to call the attention of the witness to matters highly important, which the witness could and would have proved if interrogated properly. To remedy this, the counsel for Mrs. Puryer, after she was made a defendant, asked and obtained leave to re-take his deposition, which was done. He swore to only what he would have sworn to at first, if properly interrogated. In no part of his last deposition does he, in the slightest degree, come in contact with his first deposition. The entire petition is made up of the suspicions of the counsel who drew it, as far as the petition attempts to detail the facts and to draw conclusions from them. It is so fully answered by the opinion of the Court, as rendered, that the counsel for the appellants deems it unnecessary to notice them further. He believes that the petition is filed for the purpose of delay alone. He, therefore, prays that the petition of the appellees be overruled, and that the appellants may promptly have the benefit of the decree in their favor. All of which is respectfully submitted.

R. S. WHEATLY, <i>for appellants.</i>

RESPONSE,

By Judge Breck.

A careful examination of the petition for a re-hearing, presented by the counsel for the appellees, has not resulted in the conviction that the opinion delivered ought to be disturbed.

As stated in the opinion, the question as to the ownership of the merchandize in controversy, was one of some difficulty: but an attentive examination of all the facts, without the aid or influence of extraneous matter, brought us to the conclusion that it of right belonged to the appellants—and that opinion remains unchanged. If mistaken, and the goods belonged to the Guthries, it must be upon the supposition that there was a conspiracy or combination between them and Kasson and Puryer and Morrow, and indeed including Radliffe, and an amount of perjury in the case, in gross and detail, almost incredible.

The conspiracy, we think, is not established, nor is the credibility of the witnesses successfully assailed.

In regard to that portion of the answer of J. T. Guthrie, referred to in the petition, as having been misapprehended by the Court, it may be remarked, that it was not the design of the Court to give the language of the answer. We think it most clearly to be inferred from the statements of the answer, that Guthrie received a duplicate of the bill of lading, at the mouth of the Ohio. It seems to have been signed in duplicate. Guthrie says he requested the Clerk of the boat to give him a receipt for the goods, which the Clerk gave him in his own name. Had he previously received the bill of lading, which stipulates for the delivery of the goods to Anderson & Co. certainly no further receipt could have been required, and it is presumed, none would have been given. Besides, he states that the goods were shipped by Morrow at Helena, on board the Princeton, in his, Guthrie's, care, requesting him to deliver them to a house in St. Louis, &c. But whether the statement in the opinion referred to be in the language of the answer or an inference from the facts stated in it, is matter of no moment as to the merits of the controversy.

The suggestion that all the answers were prepared by R. S. Wheatly, Esq. ought not, we think, to prejudice the rights of the appellants, but that matter has been disposed of satisfactorily by him in his replication.

We deem it unnecessary to go into an additional argument upon the facts of the case, and being satisfied with the opinion as delivered, the petition is overruled.